On behalf of the appellant, Ms. Sherry R. Silver, and on behalf of the people, Mr. Steve Walker. Ms. Silver. Good afternoon. Good afternoon, Your Honors. There is a motion to cite additional authority by the appellant, the global study on children deprived of liberty issued by the United Nations General Assembly. Yesterday was the date for an objection. Was there an objection filed? No, Your Honor. Good afternoon, Your Honors. Good afternoon, Your Honors. I am Sherry Silver, and I represent Vianca J. on behalf of the State Appellant Defender. I do also want to point out, in addition to the State's pending motion to cite additional authority, there is an error in our brief, and I apologize. It didn't seem to cause any problems for Mr. Rogers in terms of his research. The Illinois Administrative Code that's cited in our brief is cited as ILCS. It should be Ill Admin Code, so I do apologize for that. As to the State's motion to cite additional authority, it's unopposed. We're not objecting to it. But I would point out that the sections that Mr. Rogers has appended to the motion deal with the juvenile aspects of sex offenders in the Illinois Administrative Code. The reason that we don't object is because it's obviously because he's a juvenile. The problem with those provisions is that one of the things that a sentencing court is required to do is to consider the risk to re-offend, and that's delineated in those provisions. But there's no real guidance in those provisions on what type of studies that somebody who is conducting the evaluation can look to, how to use the evaluations, what basis there should be for those evaluations. And that's why we cited two of the adult provisions of the sex offender management, because those do deal with the types of studies that need to be looked at. So, again, we're not objecting to the State's motion. It doesn't alter our argument in the least, and the argument is that the court below did abuse its discretion in committing the offense to the IDJJ. There's three categories of errors here. One is that the assessment that was done was probably done appropriately in the first sex offender evaluation that was issued in August of 2018. And in that evaluation, I don't know if he's called a doctor or not. He's a licensed clinical social worker. Sundberg concluded that there was or there is no risk evaluation in that report. He concluded that there is a risk evaluation in that report.  convicted of a sexual offense were less of a male than a female sex offender and even less a juvenile. I hate to stop you there and ask you a question, but is there an issue over a plain error? I mean, were these issues raised below? Did we have a plain error issue going on here? No, I was hoping that to come later, Your Honor, but no. There is plain error under the second prong. And I'm going to point this part to Rahim M. Rahim M. talked about plain error in that case and pointed out that because the court there failed to make appropriate findings, made findings that weren't supported by the record, didn't do what the court was supposed to do, that it fit under the second prong. And that's what we were arguing, the second prong. We're also arguing, just to touch on it since we're in that area, the ineffective assistance of counsel. I think when you have a juvenile defendant who is being committed to the IPJJ, which is the ultimate sentence, the last resort that any reasonable defense attorney would have filed some sort of a post-disposition motion to preserve any errors, even if it's a pro forma motion, he should have done what was required to preserve the errors for review. So in that respect, I think we do have an ineffective claim, if Your Honor, to go down that route. But I do think the second prong of plain error applies here. Back to the assessment of risk, Sonberg, in his initial evaluation, did not include any type of differentiation of the type of risk that we were looking at because of the lack of studies that deal with juvenile female sex offenders. That came out in August of 2018. In September of 2018, the social history came out. And the social history looked only at probation and concluded without even real reference to Sonberg's report. Although, just as an aside, there's a little glitch in Sonberg's report that he said that he referred to the social history. I'm not sure how. The social history came out in September, and his report was August. So I don't know whether he had an advanced copy, or I don't know what happened. But that's just a little glitch that's in there. Caught my eye the other day. But the social history did go on to say probation wouldn't work because of Bianca's aggression and because of her family would not support any type of therapy that she would go through. So they said, jumping right to that last resort, let's put her in the IDJJ. There was nothing in that social history that dealt with the Rosecrans assessment, Rosecrans suggested outpatient treatment. There was nothing in that social history that dealt with Sonberg's recommendation of residential treatment. There was no evidence in that social history that could have been presented to the sentencing court, which in and of itself is an error under Rahim. There was no evidence presented to the court that could give the court the option of looking at something that was in that intermediate range between probation and IDJJ. But if that is true, did the court not specifically consider, wasn't the court aware of its obligation that it had to consider the least restrictive alternatives before it could place the juvenile in juvenile DLC? And didn't the court make findings related to that? The only finding that it made was that probation, as recommended by the social history, would not be appropriate. The court asked the prosecutor about sentencing a Class X offender and what services were going to be available to her in the IDJJ, not outside of the IDJJ, but in the IDJJ. So the prosecutor, they took a break in the proceedings. They went and called, the prosecutor called the IDJJ, spoke with the, it was the acting legal counsel at the time, so the upper echelon in the IDJJ, and found out that sex offender therapy was not going to be available to her, the therapy that she needed. But at the facility, however, there was information disclosed that the DJJ contracted with Indian Oaks and that it was possible, subject to a waiting list, that the therapy would be provided there or the treatment. In all respect, that's not exactly what they said. What they said was that there was a wait list and the IDJJ would assess it, basically, after she was committed to the IDJJ to see whether or not she could get treatment on a contract basis. That's not the same as saying she would get it. They would consider it. If the court had ordered her commitment as a residential facility, Indian Oaks is a residential treatment center, he could have sentenced her to that, which was less restrictive than the IDJJ. IDJJ is a last resort. The study, the global report from the UN says the same thing. We're not just talking about Winnebago County, Illinois, the United States. We're talking on a global level here now. That commitment of a minor to a facility like the IDJJ is the last resort. You have to give these kids whose brains are developing the opportunity to show you that they can change. And she was not given that opportunity. Well, again, it's indeterminate. She is still subject to discharge if there's signs of rehabilitation, correct? Sure. She doesn't have to serve until she's 21. So it's not like some of the settings that are discussed in the United Nations report. Well, some of the settings in there deal with war. Exactly. But there are sections that deal with administrative justice. And they talk about that there should be consideration for the least restrictive placements, correct? Right. And the least restrictive placement here would have been probation. Right. And the court determined that the opinions that were given were that it was not an option because of her various factors, including propensity to commit other offenses, recidivism. Well, Rosecrans did say outpatient treatment. So I'm not disagreeing. I'm talking about the other factors the court considered and other reports that were in the record, correct? Including detention reports. Including detention reports. The detention reports. There's a good question about the detention reports. The court considered the detention reports, and they covered 500 days of detention. Well, including she pleaded guilty to aggravated battery while she was in detention. But that's toward the end of her detention. Just before this. She pleaded guilty to that. Right. Okay. But one of the questions about those detention reports, she was yelling at the staff. She was kicking her door. She was flooding the cell. She was swearing like crazy. Inciting violence between other detainees. Being beat up by other detainees as well. So that's another question. But there's also a question of whether or not she's been diagnosed with intermittent explosive disorder. There's a reference in the social history, page 71 I think it is, where her mother had told the people compiling the report that she was not being given her medication. So there was an inconsistency or a lack of medication that could affect how she was behaving in there as well. Did the judge consider that part? No, he did not. He did consider the detention reports and somehow came to the conclusion that some of her conduct could be considered grooming. What was the basis for that? How do we know the trial court didn't consider that? Because it's not on the record. We're bound by the record. We're bound by what the judge considered on the record. It's an analogous argument to where sometimes in a felony case the judge recites, I've considered all the statutory factors in the aggravation and litigation. We get the argument they didn't delineate all the individual factors. The judge had the social history report. The judge had all this information you're referring to in front of him, whether he specifically enunciated or considered all of it, get it there. And as Justice Burke alluded to, as Burke had alluded to, I mean, what if the judge finds that they don't believe that given the history, given the detention reports, the aggressive behavior, there's nothing left but IDOC without specifically saying anything beyond that? Why would that be erroneous? I would point again to Rahim. Where is the actual evidence that the people preparing the social history considered intermediate, less restrictive settings? Where is the evidence that they handed that to the judge? There's none because they did not. And that is exactly what happened. What about the attorney? Didn't the attorney ask for probation? He asked for intensive probation. Okay. And the court didn't consider that? He may have. But you've got the least restrictive setting and then the last resort. Where is all this in between? The Indian Oaks placement would have been an in-between placement that the judge wasn't even going to consider. The only thing that came out about Indian Oaks is that there was this wait list and that maybe they could contract once she's committed to the IDJJ. Why not just order her to the residential placement where you know she's going to get that treatment, the treatment that she needs? The sex offender therapy was not going to be available in the IDJJ. In fact, I honestly don't remember if I read this in the record or was told this. I didn't even know where she was going to be placed because there are so few juvenile female offenders convicted of sex offenses. It's very rare. The trial court, though, was very cognizant of what the statutory requirements were and actually was the one who initiated the additional inquiry to be made so that he had all of the information that he needed in order to make his decision about the most appropriate disposition. With all respect, I'm going to disagree that he considered all of the appropriate factors. When you look at the commitment order that's at C-153, it's the standard commitment order. It sounds exactly like the commitment order that was in Rahim M. When you look at the lower portion of the front page, the court finds that secure confinement is necessary after review of the following factors. We're not denying maybe he reviewed them, but look at number F, letter F. He considered community-based services that have been provided to the minor and whether the minor was compliant with the services and the reason they were unsuccessful. She was never given community-based services, just like in Rahim M. That is one of the factors that Rahim M. emphasized. She was never given community-based services. How could the judge make a finding on that when she never got it? There are a lot of those that do that. Your argument is that if someone hasn't been given community-based services, that any commitment is air? I mean, these crimes, would you agree, they're pretty egregious? Yes, I do. I mean, they're horrific to read. It's not the type of thing. I agree with that. This is not like Rahim with what was just an aggravated aggravated abuse. You're not arguing, are you, that community-based services must be offered in every case? No, but they have to be considered. They have to be, you have to give a kid the opportunity. I can't tell you how many times in preparing this brief, and my passion is coming out here, how many times I drove to work or went home banging on my steering wheel to have the judge make these findings and say that it's in her best interest to go into a setting where she's not going to get the therapy that she needs. How can those two factors be reconciled? Well, how about the record? The record reflects that it could have been available for her through Indian Oaks when she was at the IDJJ. Do we know whether or not she's getting it? Well, that's not, that was not what the trial court's responsibility was, is to determine as to order the Department of, or I'm sorry, IDJJ to do that. He made the inquiry as to whether it would be available. I'm not sure what further would need to be done. It is the judge's obligation under the statute, under 405, 715, to impose a sentence on a kid that's the least restrictive environment that's going to help this kid through correction and punishment. That's the goal. We have that in our brief under Rodney H. That's the goal. Absolutely. But you've got, you've got a situation here where you, the judge knew she was not going to get the therapy. It wasn't available. It was an if that the therapy was going to be made available in the IDJJ. Send her to Indian Oaks where it's definite. Well, he also determined that there would be additional treatment available to her through IDJJ for her. The standard, the standard ones. Yes, exactly, including emotional needs, et cetera. And she had this IED, explosive disorder, intermittent explosive disorder. She had a drug problem. All of that was available to her. But if I could just make one more last point and then conclude. My last point would be that, yes, those therapies are available as they are to any kid because it is the goal of the department or the IDJJ to help kids rehabilitate. Absolutely. But there was a statement on the record by the prosecutor when they were talking about the information from the IDJJ that she would get mental health therapy, but the people who were going to give it to her were not qualified. It was not their specialty to give sex offender therapy, and that's what she needed. That was available to her at Indian Oaks, and that's where the judge should have sent her. But he wasn't given the evidence of that. He wasn't given the full story of that. How long a wait list? What is it that they do at Indian Oaks? How is this different from IDJJ? None of that evidence was given to him. And under Rahim, this should be vacated and sent back for a new sentencing hearing. Thank you. We have time for a vote. Thank you. Mr. Rogers. Good afternoon, Your Honors. Counsel, may it please the Court. My name is Stephen Rogers, and I represent the people of the state of Illinois. Your Honors, I'll respond to each of the three arguments made by a respondent in this case. The first is that the trial court's decision was an abuse of discretion. That's broken down really into two parts. One is that the trial court considered an inappropriate sex offender evaluation. I think it's clear in the distinction through the administrative code that only when an adult sex offender evaluation is done is it required to be based on empirically grounded studies, which makes sense because, as it regards female youth sex offenders, there are no empirically grounded studies to base it. And that would be in direct conflict with the administrative code for juveniles, which requires the evaluation to describe the juvenile's risk for reoffense. The second is the respondent's argument that the trial court did not consider all the necessary factors. But the record bears out that the trial court considered every factor except for F, which would be what community-based services have been provided during detention, because she was in detention for approximately 500 days. But all the other factors the trial court did consider, those factors were laid out in the social history report, and the trial court recited most of them in an approximately 15-page ruling, which, from the state's perspective, was very thorough. Then under the plain error argument, the respondent's argument is that the trial court never considered less restrictive alternatives to commitment. It was not preserved, so the error must be clear or obvious to warrant relief. The trial court expressly considered, on the record, intensive probation that would have encompassed community-based services. However, the trial court also laid out why those efforts would be unsuccessful. The court did specifically consider intensive probation. Yes, Your Honor. A lesser restrictive alternative, and the enunciated reasons why that was not appropriate? Yes, Your Honor. And so the trial court rejected probation, which was the request made by respondent's counsel, and the reasons were the detention reports, which essentially laid out the respondent was not willing to follow rules. You had verbal outbursts. You had threats. There were an aggravated battery to another minor, along with damaging the property, kicking in the door and flooding her pot. Well, opposing counsel would say, well, yes, intensive probation would be one least restrictive alternative or lesser restrictive alternative, but the trial judge didn't consider anything else. Is that true? Well, Your Honor, early on there was a Rosecrans assessment, which recommended outpatient treatment, but I think after 500 days when sentencing was ultimately to be done in this case, the trial court's decision was if she could not follow the rules and make any progress in custody, what was the likelihood she would succeed in any other setting? Did the court make any specific comments about that? No, Your Honor. Nothing was offered, either by respondent's counsel below. You know, when the trial court asked about IVJJ and whether Indian Oaks would be available, it indicated there would be a wait list. So there's nothing to show that there was an opening in Indian Oaks for someone who would be sentenced directly to that situation. Moreover, the trial court looked at the severity of the offenses in this case, which were pretty horrific, and also respondent didn't believe she needed to change. So sending her simply to Indian Oaks to receive sex offender treatment was not likely to be successful when she herself didn't believe that she needed treatment. And in this case especially, there were multiple avenues that needed to be considered. As respondent has addressed, she was diagnosed with intermittent explosive disorder and also PTSD through Rosecrans, and then she has the sex offender issues and then also a substance abuse issue at her young age. And so the Department of Juvenile Justice was likely going to be the best situation to resolve all of those issues at one time, as opposed to sending her to Indian Oaks and then to Rosecrans and then to different locations to address each of those issues. The last claim made by respondent is the ineffective assistance claim. And respondent relies on Owens, where when a defendant is sentenced to 18 years, he immediately yells out, appeal that. Instead of filing a motion to reconsider a sentence, his trial counsel asks to withdraw. The trial court essentially says, hold on a minute, don't you want to file a notice of appeal? And trial counsel says yes, essentially waiving any sentencing issue which defendant has just worded out that he would like to challenge. In this case, to the contrary, the trial court gave respondent and counsel time to discuss their appeal options, then gave the appeal admonishments, and not until the last day did respondent indicate any desire to appeal. Respondents claim that of course she would have wanted to appeal based on speculation, what logically or illogically would have happened, but there's certainly nothing in the record that indicates that the trial counsel did not consult with respondent about her ability to challenge the sentence. Now didn't the trial court also have to consider what would be best for the community and balance that along with what would be best for the minor? Absolutely, Your Honor. And that had to do with the safety of others in the community. Yes, Your Honor. And the trial court enumerated, did it not, the reasons that he felt that she might be a threat to those in the community? Yes, Your Honor. Certainly within her family constellation. Yes, Your Honor. She did have two, she had at least one very young brother who by the time of sentencing should have been around six or seven and then a slightly older brother, but two individuals that the court would have reasonably expected to be at risk. And the court commented on there's the housing instability. It seems that the family is constantly living with other families, which is fine except for those families also may come with children, which is what happened in this case. So the trial court had a lot to balance and from the state's perspective did balance really a very lengthy ruling. And as the court noted earlier, the trial court was the one that said, hey, go call the Department of Juvenile Justice and let's see what's available. And that's actually the last consideration under 705 ILCS 405-5-750 is what services are available in the Department of Juvenile Justice that will meet the individual's needs. So from the state's perspective, the trial court went above and beyond to consider all the factors, made a very reasoned decision in this case, certainly was not an abuse of discretion, and the state believes it was not plain error and that the court did consider less restrictive alternatives. Thank you. Thank you. Ms. Silver, rebuttal. Just to respond to Justice Zinoff's comment about considering the safety of the community. Absolutely. It's a balance of the safety of the community with the services and necessity to provide for the kid, the things that are necessary for that kid to develop, to overcome the things that are causing this kid to break the law, to cause all these issues. All of that needs to be there. Absolutely. It's not necessarily the best interest of the kid. It's the best interest of the community is what the case law says. It's the best interest of the community to be balanced with the correction and punishment with the kid. Absolutely. But we're saying that balance is askew here because there is a less restrictive setting for which the judge did not have enough information. There was no evidence for him to consider it appropriately and adequately that this kid could have gotten what she needed and still maintain the safety of the public and her family, absolutely her family, by sending her to Indian Oaks or some other like facility. That's where this is a problem. And it's not, you know, as Mr. Rogers said, it's the inappropriate sex offender evaluation. It's not necessarily an inappropriate sex offender evaluation. It's the consideration of that evaluation because some groups said there's no empirical grounds, and that does apply. How else do you assess a risk if you don't have studies that are going to give you some basis to assess it? You have to look at the adult sections to know that there has to be some grounds for it, and Sonnenberg referred to it. He referred to the Applewhite study, which laid out, I think it was three sections that deal with female sex offenders, that they're curious, reactive, and abusive. But then he went ahead in the addendum, the new risk assessment that the judge ordered, and looked at a comparison with male adolescent sex offenders. Why? What happened to the female assessment that he had in the initial evaluation? I don't mean to put down the judge, but it's like the judge saw the recommendation from the social history that the kid be put away in the IDJJ, and he wanted verification that that's what we should do. And that's when that second evaluation was ordered, and that's when Sonnenberg came back and put her at a high risk. But he put her at the high risk looking at the same exact information he had in the initial evaluation. Now, did the trial judge ask somebody to check into Lyndon Oaks? Check into a possible placement at Lyndon Oaks? Lyndon Oaks? Yeah, where did Mr. Ratner take it? Indian Oaks. Right, Indian Oaks is what they were talking about. He asked the prosecutor to make a call to the IDJJ to find out what services were going to be available to her in the IDJJ. The information that came back is that there was this Indian Oaks that... There was a wait list. There was a wait list, but for what, we don't know, and how long, we don't know. But also, that was the only information about it. Can we infer that this was about her situation? That when they said there was a wait list, that they would have provided the information as to who the person was to be placed there? I don't know that we could infer that. You've got the privacy issues with juvenile cases, so I don't know that. I don't know how to answer that. Even if we can't infer that, we can clearly infer that he was considering another alternative besides the juvenile department of corrections, right? But the only information he was given was that the IDJJ could, if they evaluated it, contract with Indian Oaks. He didn't look at it as a residential placement. He looked at it as a contract deal with the IDJJ. Residential treatment at Indian Oaks would have been a less restrictive setting, would have been more appropriate. It would have kept her out of the general public. It would have kept her away from her younger siblings, who she may have this potential to meet with. Would you agree that the IDJJ, they have a responsibility to evaluate her, correct? Actually, under the ill-admin code, there's a continuing evaluation process. Right. So, I mean, she is going to receive services. We just don't know exactly what they are, right? She will receive hopefully some of the services that the prosecutor did list. Hopefully. We don't know what services she would be eligible for, what's available to her. We know for a fact that there's no sex offender therapy in the IDJJ. It would have to be contracted out. Exactly, if that's what they determined was necessary. But as I said, there's this continuing obligation to evaluate as the case goes on with the juvenile cases. The other setting that the judge did not consider, did not give any evidence of, was the Rosecrans assessment recommended outpatient treatment, outpatient treatment, at the Berry Center. I don't even know what the Berry Center is. I've seen its name. I don't know what it is. It services youth in the community who have emotional problems. Okay, maybe not the appropriate setting then. But I read the record to say, to reflect that it was residential treatment that was recommended, not outpatient. I could be misremembering. That's absolutely possible. I know Sundberg recommended residential treatment, and he also recommended an additional further psychological or psychiatric evaluation. Right. All right, thank you very much. Thank you. The court thanks both parties for their arguments today. The case will be taken under advisement. A written decision will be issued.